AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>The subject property located at 1528 E. 41st Place, Los )<br>Angeles, California 90011, as described in Attachment A )<br>) | Case No.  2:18-MJ-823 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Possession with Intent to Distribute a Controlled<br>Substance; Conspiracy |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Theodore Russell, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: W. Rollins, x7407

<u>ATTACHMENT A</u>

<u>Southernmost Residential Building at 1528 E. 41st Place, Los</u>

<u>Angeles, California 90011</u>




The SUBJECT PROPERTY is the southernmost residential
building located at 1528 E. 41st Place, Los Angeles, California,
90011.  The location containing the SUBJECT PROPERTY includes
two single-story residences and one garage-sized building that
appears to be a garage or shed.  The SUBJECT PROPERTY is the
second and southernmost of the two single-story residences at
the address; it is a white residential building with a dark
brown or black roof and is located behind the front residence at
1528 E. 41st Place, closer to E. 42nd Street.  The front residence
faces north towards E. 41st Place and is a peach-colored building
with brown trim and accents with a light gray roof.  The SUBJECT

Instrumentality Protocol

PROPERTY includes all rooms, attics, basements, and other parts therein.   The SUBJECT PROPERTY includes the surrounding storage rooms, trash containers, and safes.   The location containing the SUBJECT PROPERTY is contained by a black wrought iron fence to the north and east and a cinder block wall to the west.   The wall/fence is approximately 5 feet tall.   The driveway entrance from E. 41st Place provides access to all three residences/buildings – including the SUBJECT PROPERTY – that are located at the address.

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   Evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communication Facility in the Commission of a Drug Trafficking Offense), namely:

a.   Any controlled substances, controlled substance analogues, or listed chemicals;

b.   Any firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons;

c.   United States currency in excess of $1,000, including the first $1,000 if more than $1,000 is found;

d.   Bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds), including the first $1,000 if instruments worth more than $1,000 are found;

e.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing and canning devices, balloons, packaging materials, aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease, containers, and money counters;

f.    Diluents and other agents used to dilute, or "cut," drugs in order to increase the drugs' volume or weight, including mannitol, mannite, lactose, Vitamin B12, and MSM;

g.    Equipment used in the packaging and distribution of drugs, including manual and automated pill-press machines, scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses, masking agents, tape, heat sealers and heat sealed bags, Ziploc bags, hermetically sealed pouches, and other containers;

h.    Items used in the packaging of currency for consolidation and transportation, including money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

i.    Documents, records, and other items relating to the use of USPS or commercial express mail delivery companies, such as FedEx and UPS, to ship drugs and money to various points within the United States, including air bills, empty or previously used mailing boxes, packing tape, packaging materials, package tracking records, and transaction receipts;

j.    Documents and records relating to travel by air, bus, car, or other means, including calendars, travel itineraries, maps, airline ticket, baggage check stubs, frequent use club membership information, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas;

k.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply for controlled substances, or drug customers, sources of funds, financial records, records that may indicate ownership of cash and funds, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs, and videos;

l.    Records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and times when controlled substances were bought, sold, or otherwise distributed;

m.    Documents or records relating to any bank accounts, credit card accounts, other financial accounts, and wire transfer records.

n.    Documents and keys relating to public storage units, rental cars, safety deposit boxes, or Commercial Mail Receiving Agencies;

o.    Contents of any calendar or date book, including calendars or date books stored on digital devices;

p.    Any materials, documents, or records that show the identity of the person(s) controlling, occupying, possessing, residing in, or owning the SUBJECT PROPERTY, including rental agreements, leases, rent receipts, deeds, escrow documents, utility bills, insurance documents,

registration documents, clothing, personal affects, and other mailed envelopes reflecting the address and addressee;

q. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

r. With respect to any digital device used to facilitate that above-listed violations or with respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

  ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

  iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

  c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

  d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

  e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

  f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of items to be seized, the government may retain
forensic copies of the digital device but may not access data
falling outside the scope of the items to be seized (after the
time for searching the device has expired) absent further court
order.

       g.    The government may retain a digital device itself
until further order of the Court or one year after the
conclusion of the criminal investigation or case (whichever is
latest), only if the device is determined to be an
instrumentality of an offense under investigation or the
government, within 14 days following the time period authorized
by the Court for completing the search, obtains an order from
the Court authorizing retention of the device (or while an
application for such an order is pending). Otherwise, the
government must return the device.

       h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

    5.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

       a.    Any digital device capable of being used to
commit, further or store evidence of the offense(s) listed
above;

      b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of any person, who is located at the SUBJECT PROPERTY during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PROPERTY and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such

device.    Law enforcement personnel shall direct which specific finger(s) and/or thumb(s) shall be depressed.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Special Agent Theodore Russell, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of an application for a warrant to search the following:

a.  A residence located at 1528 E. 41st Place, Los Angeles, California 90011, (the "SUBJECT PROPERTY").  The location containing the SUBJECT PROPERTY contains two residential buildings and a third building that appears to be a garage or shed.  The SUBJECT PROPERTY is the southernmost of the two residential buildings and is north of the garage/shed, as described more fully in Attachment A, which is incorporated herein by reference.

2.  The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated by reference: Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) (Distribution and Possession with Intent to Distribute Controlled Substances), and 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) (the "SUBJECT OFFENSES").

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal

complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF SPECIAL AGENT THEODORE RUSSELL

4. I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code. I am empowered by law to conduct investigations of, and to make arrests for, federal felony offenses.

5. I am currently assigned to the DEA Los Angeles Field Division Financial Investigations Group, which investigates large-scale narcotics and money laundering organizations. I was hired by the DEA on September 22, 2012, and attended the DEA Academy from September 24, 2012, to January 24, 2013. At the DEA Academy, I was trained in all aspects of conducting narcotics investigations. Prior to being hired by the DEA, I worked as police officer for Case Western University in Cleveland, Ohio from June 2010 until September 2012 and as a police officer for the City of East Cleveland, Ohio from November 2010 until June 2011.

6. Since becoming a DEA agent, I have received specialized and on-the-job training regarding a variety of criminal activities including money laundering, drug trafficking, and surveillance. I have participated in criminal

2          **Instrumentality Protocol**

investigations involving various crimes, including money laundering and drug trafficking. Based on my training and experience, I am familiar with the methods drug traffickers use to finance drug transactions and launder drug proceeds. I am also familiar with the ways in which drug traffickers use digital devices to coordinate, further, and/or conceal their illegal activities.

7. As a law enforcement officer, I have participated in criminal investigations that have employed a variety of investigative techniques, including electronic surveillance, such as court-authorized interception of wire, oral, and other electronic communications. I have also conducted telephone toll analysis, undercover operations, physical surveillance, and I have handled and debriefed informants.

8. I make this affidavit based upon my training and experience, personal knowledge derived from my participation in this investigation, and information from a variety of sources that I believe to be reliable, including the following:

a. Oral and written reports and documents about this investigation and other investigations that I have received and reviewed from law enforcement personnel of the DEA and other federal and local law enforcement agencies in the United States;

b. Discussions I have had concerning this investigation with other federal and local investigators who are participating in this investigation;

      c.    Physical surveillance conducted by federal and local law enforcement officers, the results of which have been reported to me either directly or indirectly;

      d.    Public records and databases;

      e.    Telephone records, information, and telephone subscriber information;

      f.    A review of summaries of consensually monitored telephone calls and meetings;

      g.    Statements of cooperating sources of information;

      h.    Statements and reports made by undercover agents;

      i.    A review of electronic surveillance devices such as covert audio surveillance, which has been translated in summary form from Spanish to English by translators.

9.  When I assert that a statement was made or that an event occurred, that information came either from my personal knowledge or from another source of information, including those I have listed above. Further, based on my training and experience, and the training and experience of other law enforcement officers with whom I am investigating this case, statements that are recounted in this affidavit have frequently been "decoded," meaning that I have provided what I believe to be the intended substance of the statement, even though the language used in the actual statement may have been cryptic or coded in an effort to mask the criminal content of the statement. Finally, some statements that are recounted in this affidavit may have been originally made in a foreign language.

I have provided the English translation, including the decoded substance of the statement.

### III. SUMMARY OF PROBABLE CAUSE

10. After receiving $4,000 in exchange for delivering about 15.2 kilograms of methamphetamine to an undercover agent ("UC") at the Citadel Outlets in Commerce, California, Reynaldo GONZALEZ-Arreola (hereinafter "GONZALEZ") drove back to the SUBJECT PROPERTY. GONZALEZ lists the address for the SUBJECT PROPERTY on his California driver's license, and California Department of Motor Vehicle ("DMV") Records indicate that GONZALEZ resides at that same address. DEA agents have seen GONZALEZ enter the SUBJECT PROPERTY, and they have seen GONZALEZ's vehicle parked outside the SUBJECT PROPERTY on at least two occasions.

### IV. STATEMENT OF PROBABLE CAUSE

**A.    Investigation into Drug Shipments from L.A. to Atlanta**

11. The DEA is conducting a criminal investigation involving individuals who are believed to be involved in a drug conspiracy sending drugs from locations in the United States, including Los Angeles, California, to the Atlanta, Georgia area, concerning violations of federal laws, including 21 U.S.C. §§ 841, 843(b), and 846.

12. Specifically, in March of 2018, DEA Atlanta agents received information from a DEA Confidential Source ("CS") about a pending drug shipment, originating in California, and destined for Atlanta. On March 14, 2018, the CS told DEA

Atlanta agents that FNU LNU, a/k/a Fernando (later identified as Fernando HERRERA-Rojas, hereinafter "HERRERA"), using telephone number 501-414-7682, was responsible for coordinating a shipment of drugs from Los Angeles, California to Atlanta, Georgia. DEA Atlanta agents decided to introduce an undercover agent to act as the transporter who would pick up the drugs for HERRERA.

### B.    Arrangement for UC's Purchase of Methamphetamine

13. On March 14, 2018, an undercover agent ("UC") placed a recorded phone call to HERRERA. The conversation was conducted in Spanish. HERRERA asked when the UC would be able to travel "over there." HERRERA said he had "stuff" that needed to be picked up in Los Angeles and brought back "here" to Atlanta. The UC said he could arrive in Los Angeles on Tuesday (March 20, 2018). HERRERA agreed to that date and told the UC that HERRERA did not want the UC to travel on "10." HERRERA said the organization had another driver who they told to stay off "10," but the driver drove on I-10 anyways, got stopped, and "lost it." HERRERA said the UC would receive a call from another member of the organization with details.

14. That same day, at approximately 2:51 p.m., Yadira GOMEZ-Gonzalez (hereinafter "GOMEZ"), using telephone number 832-815-5110, called the UC in a call that was recorded. The two parties greeted and the call was disconnected. At approximately 2:58 p.m., GOMEZ called the UC again in a call that was recorded. GOMEZ told the UC that she was "Fernando's wife." GOMEZ and the UC discussed the UC's ability to pick up

a drug shipment in Los Angeles and transport the drugs back to Atlanta, Georgia.

15. Specifically, GOMEZ told the UC that HERRERA told her the UC could "be there" by Tuesday (March 20, 2018). GOMEZ also told the UC "it paid 300," but if the UC could get the transport done in a short time frame, then the price would be "400." The UC asked GOMEZ when the UC would be paid for the trip. GOMEZ said, "I will receive it," and when the UC came "over here," she would pay the UC. Based on my training and experience, the amount paid to the UC is per unit of narcotics.

16. On March 20, 2018, the UC exchanged several recorded calls with GOMEZ, during which GOMEZ said the UC would receive "14," and an associate of hers would contact the UC to drop off the shipment. The UC also indicated to GOMEZ that he was in the Commerce, California area and would be able to meet with GOMEZ's associate there. Based on my training and experience, the amount of "14" refers 14 kilograms of narcotics.

C. **GONZALEZ Arrives for the Controlled Buy**

17. That same day, the UC received a telephone call from an individual later determined to be GONZALEZ, using telephone number 310-525-0798. During this recorded call, the UC identified his current location, and GONZALEZ agreed to meet the UC at the Citadel Outlets in Commerce, California.

18. At approximately 11:20 a.m., GONZALEZ called the UC in a call that was recorded and said he was driving a black Toyota Corolla. At approximately the same time, Los Angeles DEA agents conducting surveillance saw a black Toyota Corolla pull

7        **Instrumentality Protocol**

up and park at the rear of the UC's vehicle in the parking lot.
Surveillance units identified GONZALEZ by his license plate
information and driver's license photograph, which was obtained
from Department of Motor Vehicle ("DMV") records associated
with his license plate. The UC also identified GONZALEZ's
driver's license photograph as the same individual who was
driving the Toyota.

### D. GONZALEZ Provides 15.4 Kilos of Methamphetamine to the UC in Exchange for $4,000 and Drives Back to the SUBJECT PROPERTY

19. The UC got out of the UC vehicle and spoke briefly
with GONZALEZ. GONZALEZ instructed the UC to go to the trunk
of the black Toyota Corolla. The UC went to the trunk of
GONZALEZ's vehicle and removed a large black duffel bag and
placed it in the UC's vehicle. GONZALEZ also paid the UC
$4,000 for picking up the duffel bag, which we later learned
contained about 15.2 kilograms of methamphetamine. GONZALEZ
then left the area of the Citadel Outlets.

20. Los Angeles DEA agents then continued to follow
GONZALEZ as he drove directly to the location of the SUBJECT
PROPERTY. Surveillance units saw GONZALEZ park on the apron of
the driveway at the location containing the SUBJECT PROPERTY
and walk past the first residence and then into a door of the
SUBJECT PROPERTY. Approximately 10 minutes later, surveillance
units observed GONZALEZ walking out of the SUBJECT PROPERTY and
get into the Toyota Corolla. Units continued to follow

GONZALEZ from the SUBJECT PROPERTY, however surveillance was terminated in the downtown Los Angeles area.

21. That same day, DEA agents transported the black duffel bag, which contained 34 individually wrapped packages weighing a total of 15.2 kilograms, to the DEA office in Los Angeles, California. The substance inside the packages tested positive for the presence of methamphetamine, a Schedule II controlled substance, and has been submitted to the DEA laboratory for further analysis.

22. On March 26, 2018, the UC provided GOMEZ and HERRERA 34 bundles of sham methamphetamine in the Atlanta, Georgia area. Upon identifying where GOMEZ and HERRERA took the sham methamphetamine, DEA Atlanta agents executed a search at the location and arrested GOMEZ and HERRERA. While searching GOMEZ and HERRERA's residence, there was evidence that GOMEZ was attempting to destroy the 34 bundles of sham methamphetamine when agents approached HERRERA's residence.

23. On March 27, 2018, DEA Atlanta filed criminal complaints and obtained arrest warrants for GOMEZ, HERRERA and GONZALEZ in the Northern District of Georgia for knowingly and intentionally possessing with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and conspiracy in violation of 21 U.S.C. § 846.

24. According to a California DMV database, GONZALEZ's residence is listed as the same address that contains the SUBJECT PROPERTY. In addition, GONZALEZ's driver's license

indicates that he lives at the address for the SUBJECT
PROPERTY.

25. On April 3, 2018, I drove by the SUBJECT PROPERTY and
saw GONZALEZ's Toyota Corolla once again parked outside the
residence.

## V.  TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

26. Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other
law enforcement agents, I know the following:

a.    Drug traffickers often store documents and other
items relating to the possession, manufacture, importation,
exportation, and distribution of drugs and to the illegal
proceeds of drug trafficking in their residences, stash houses,
and cars where they are readily available and concealed from law
enforcement.   These documents and items include invoices,
shipping labels, tracking numbers, boxes, and envelopes.

b.    Drug traffickers commonly store drugs and drug
paraphernalia, including packaging materials, cutting agents,
and manufacturing tools, in their residences, stash houses, and
cars where they are readily available and concealed from law
enforcement.

c.    Drug traffickers attempt to mask the distinct
odors of particular drugs through the use of heat sealing and
canning devices or aromatic substances such as laundry soap,
dryer sheets, air fresheners, or axle grease.   Drug traffickers
also use several packaging layers when shipping drugs to
decrease the odor.

d.    Drug traffickers keep books, receipts, notes, ledgers, and other records relating to their drug distribution activities.  Because drug traffickers often "front" drugs to their customers - that is, sell the drugs on credit - or receive drugs from their suppliers on credit, such records are necessary to keep track of the amounts paid and owed by/to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets," and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets.  "Pay/owe sheets" are frequently encoded in order to protect the identities of customers and suppliers.  Drug traffickers often keep such records in their residences (even if only intermittently used), stash houses, and cars.

e.    Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value, which are either the proceeds from drug sales or are intended for the purchase of drugs.  When drug traffickers amass such wealth, they often attempt to conceal it and its origin from discovery by law enforcement. Drug traffickers use many different techniques to do so, including using digital currency, and using savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source.  Drug traffickers also use drug proceeds to purchase real estate or cars, and establish shell corporations and business fronts that they use to launder drug

proceeds. Drug traffickers often use fictitious or "straw-holder" owners to conceal the true ownership of real estate, cars, or other valuable items purchased with the proceeds of drug sales. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution activities. Drug traffickers often keep these items of value, and records relating to them, in their residences (even if only intermittently used), stash houses, and cars where they are readily available and concealed from law enforcement.

f. Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value, and records relating to their drug business. This is to safeguard those items against robbery and keep them hidden from law · enforcement. Drug traffickers hide these items by storing them in secure locations, including safes, vaults, or other locked containers, as well as in specially-constructed concealed compartments that are often found in cars used for drug trafficking. Other methods of concealment include the burial of items underground, the use of locked cars, trailers, out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas, and the use of sealed cans and canning machines.

g. Drug traffickers often use USPS or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money throughout the United States. They do so, at least in part, because of the convenience of the service, the

availability of internet and phone tracking services, the speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use handwritten air bills, drop the packages near closing time, pay for such services in cash, and use fictitious names, addresses, and telephone numbers to avoid detection by law enforcement. Drug traffickers frequently keep records relating to their use of these services, such as receipts, copies of air bills, empty and previously used boxes, packing tape, packaging materials, and package tracking records printed from the internet, in their residences (even if only intermittently used), stash houses, and cars, where they are easily available for reference.

       h.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained in their residences (even if only intermittently used), stash houses, and cars, where they are readily available and concealed from law enforcement. Moreover, such records are often stored electronically within the memory of telephones,

computers, and personal digital assistants such as iPhone and
Blackberry devices.

i. Drug traffickers often travel by car, bus, train,
or airplane, both domestically and to foreign countries, in
connection with their illegal activities in order to meet with
co-conspirators, conduct drug transactions, and transport drugs
or drug proceeds. Documents relating to such travel, such as
calendars, travel itineraries, maps, airline tickets, baggage
stubs, frequent use club membership information, airline, rental
car, and hotel receipts, credit card bills, photographs, videos,
passports, and visas, are often kept by drug traffickers in
their residences (even if only intermittently used), stash
houses, and cars where they are readily available.

j. Drug traffickers frequently possess firearms,
ammunition, silencers, explosives, incendiary devices, and other
dangerous weapons to protect their profits and supply of drugs
from others who might attempt to forcibly take such items and
harm the drug traffickers during transactions. Such weapons,
which are often stolen or otherwise possessed illegally, are
typically kept in their residences (even if only intermittently
used), stash houses, and cars where they are concealed from law
enforcement and readily available.

k. Drug traffickers often use two-way radios, police
scanners, video surveillance systems, and other counter
surveillance equipment to prevent detection by law enforcement.
Such items are typically kept in their residences (even if only
intermittently used), stash houses, and cars.

14    Instrumentality Protocol

l.    Drug traffickers frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs.  Such items are often stored in their residences (even if only intermittently used) and cars, and on digital devices.

m.    Drug traffickers often use digital and electronic devices such as cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities.  Drug traffickers often keep the documents and records described above on those devices.  Drug traffickers often use multiple phones, including not only their own phones but also phones of family members and significant others, in order to avoid detection by law enforcement.  Drug traffickers often keep these devices in their residences (even if only intermittently used), stash houses, and cars where they are readily available.

## VI. TRAINING AND EXPERTISE RELATED TO DIGITAL DEVICES

27. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

onto a hard drive, deleted, or viewed via the Internet.[1]
Electronic files saved to a hard drive can be stored for years
with little or no cost. Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools. Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data. Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten. In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file. Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache. The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content. Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[1] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

   e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence

      19  **Instrumentality Protocol**

in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else·to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

        g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

28. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor. Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID." Once a user has set up the fingerprint sensor feature in the security settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or

thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

29. In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device. For example, with Apple's Touch ID feature, these circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked; and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password· has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made. Other brands have similar restrictions. I do not know the passcodes of the devices likely to be found at the SUBJECT PROPERTY.

30. For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of any user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search

warrant. The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at the SUBJECT PROPERTY during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PROPERTY and falls within the scope of the warrant. The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search. Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

31. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means, though state wire taps and subpoenas have been obtained that have provided some of the information that will be located on digital devices like cellular telephones. However, most of the information sought will not have been available through the use of wiretaps and the other similar orders that have been authorized during the course of this investigation.

//

//

23      Instrumentality Protocol

## VII. CONCLUSION

32. For all the reasons described above, there is probable cause to believe that the evidence, fruits, and instrumentalities of the SUBJECT OFFENSES described in Attachment B will be found at the SUBJECT PROPERTY, described in Attachment A.

_____

THEODORE RUSSELL
Special Agent,
Drug Enforcement
Administration

Subscribed to and sworn before me
this _____ day of April, 2018.


_____
UNITED STATES MAGISTRATE JUDGE